787 So.2d 77 (2001)
James Charles ACKER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-3665.
District Court of Appeal of Florida, Second District.
March 9, 2001.
Rehearing Denied April 27, 2001.
*78 James E. Felman, Stuart C. Markman, and Katherine Earle Yanes of Kynes, Markman & Felman, P.A., Tampa, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Patricia E. Davenport, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
James Acker appeals from a final order denying his motion for postconviction relief after evidentiary hearing regarding his convictions for two counts of first-degree murder. He contends that his trial counsel's failure to develop a coherent theory of defense, introduction of damaging evidence, and delivery of a closing argument harmful to Acker constituted ineffective assistance of counsel. We agree and, accordingly, reverse and remand for a new trial.
Following a jury trial, Acker was convicted of two counts of first-degree murder. His conviction was affirmed on direct appeal. Acker filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, stating as a ground for relief the ineffectiveness of his trial counsel, Simson Unterberger. The trial court denied the motion regarding several aspects of the claim without a hearing and granted a hearing as to the remaining ineffective assistance grounds. Following a hearing, the trial court entered an order denying Acker's motion for postconviction relief as to all grounds.
This case involves a double murder that took place the night of January 10, 1991, at a Tampa apartment complex. Brandon Snider was stabbed to death and his roommate, Robert Carter, was shot in their apartment. A neighbor told investigators she saw two people leaving the apartment after the murders occurredone bearded man with long hair and a second person who could have been either a woman or a man. That neighbor and several others then saw three men cross the parking lot of the apartment complex and get into a light-colored Ford sedan. The eyewitnesses were able to describe in detail only the bearded man with long hair.
Analysis showed fingerprints found in blood in the apartment belonged to a man named Patrick Hannon. Based on the fingerprint identification, Hannon was arrested and charged with the murders. He was later identified as the long-haired, bearded man the neighbors had seen at the apartment complex. Shortly after Hannon's arrest, Ron Richardson was identified as one of the other two perpetrators and was also charged with two counts of first-degree murder. No physical evidence connected Acker with the crimes.
Hannon was brought to trial in July 1991. During Hannon's trial, Richardson entered into a plea agreement with the State that required him to testify against Hannon and identify the third person who participated in the murders. At the time Richardson entered into the plea deal, it was known that the gun used in the murders had belonged to Ron Richardson's brother, Mike Richardson. It was also known that the eyewitnesses saw the murderers drive away from the crime scene in a car that was the same make, model, and color as Mike Richardson's car. Further, it was known that Mike Richardson was with Hannon and Ron Richardson the night of the murders.
Ron Richardson claimed that the unknown third person involved in the murders was not his brother but Acker. In exchange for his cooperation, the two counts of first-degree murder against Ron Richardson were reduced to a single count of accessory after the fact. As a result of *79 the plea deal, he served just fourteen months in prison. Acker was arrested the same day the jury returned a verdict in Hannon's trial.
Attorney Unterberger was appointed to represent Acker in the guilt phase of his trial. At the postconviction hearing, Unterberger testified that at the outset of Acker's trial there were three theories of defense possible, given the circumstances of the case: (1) Acker was not with Hannon and Ron Richardson at all on the night of the offense; (2) Acker was with Hannon and Ron Richardson that night but was not present at the scene of the crime; or (3) Acker was present at the scene of the crime but was not one of the killers. Unterberger admitted that at the commencement of the trial he had not made a decision as to which theory of defense he would pursue.
Unterberger claimed that he considered arguing in connection with the first or the second theory that the third person at the apartment was not Acker but Ron Richardson's brother, Mike Richardson. Unterberger acknowledged he was aware that no physical evidence connected Acker to the crime scene and the only testimony that Acker had been the third murderer would come from Ron Richardson. He knew that the car that the murderers drove away from the crime scene was Mike Richardson's car and that the gun that was used in the murders had belonged to Mike Richardson. In a case that involved a brutal stabbing, Unterberger knew Hannon, Ron Richardson, and Mike Richardson worked together at a slaughterhouse. Unterberger also knew Mike Richardson had admitted he was with Hannon and Ron Richardson the night of the murders. After Ron Richardson's arrest, Mike Richardson for the first time claimed that Acker was also with them that night.
The State's theory of the case, as laid out in its opening statement, was that Hannon, Ron Richardson, and Acker went to the apartment and that Hannon and Acker committed the murders. Unterberger responded to the State's opening by conceding in his opening statement that there was evidence Acker was in fact the third killer:
There are three participants, shall we say, three people involved in the sense that three people go to this apartment and three people exit the apartment. He's [referring to the prosecutor] clearly correct, that two of those people are Ron Richardson and Hannon. There's certainly some evidence that will indicate that the third person was Mr. Acker.
Unterberger did not follow up this statement with any indication that Acker was not the third person involved in the murders. Unterberger did not suggest in his opening statement that Acker was not guilty. Nor did Unterberger ever suggest the third person might have been Mike Richardson.
In the State's case in chief, the physical evidence and medical testimony presented did not connect Acker to the murders. The eyewitnesses at the apartment complex did not identify Acker as one of the men they saw that night.
Pam Deimund, a neighbor at the apartment complex, originally told police she saw one man and one person who might have been either a man or a woman come out of the victims' apartment. At Acker's trial, Deimund changed her account and testified that the second person she saw was a man with shoulder-length brown hair. She did not identify Acker as this man. There was testimony that on the date of the murders Acker had shoulder-length brown hair. Although Deimund's testimony was inconsistent with both her earlier statements to investigators and her *80 testimony at Hannon's trial that she had not focused on the second person and did not recall the length of that person's hair, Unterberger did not cross-examine her regarding the inconsistency.
The State relied heavily on Ron Richardson's testimony. Ron Richardson admitted that: (1) he was with his brother Mike and Hannon the night of the murders; (2) the gun used in the murders had belonged to his brother; and (3) the car driven to the apartment complex belonged to his brother. However, Ron Richardson claimed that Mike had stayed home alone while he, Hannon, and Acker had gone to the apartment complex. He also claimed that he had no part in the killings and that only Hannon and Acker had participated in the murders.
Ron Richardson acknowledged on cross-examination that he was aware a woman named Robin Eckert had told the police that on the night of the murders she overheard Ron Richardson say, "We murdered `em," and that, according to Eckert, he had then grabbed her and threatened that if she ever repeated what he said, he would kill her son. Ron Richardson admitted that Eckert and another woman, Kamla Allersma, were at his house the night of the murders, but he claimed the two women were gone before the men left.
Mike Richardson testified that Ron Richardson, Acker, and Hannon left Ron's house and that he stayed at Ron's house with Robin Eckert and Kamla Allersma and later fell asleep on the couch. Mike Richardson admitted that although he had been interviewed several times in the weeks following the murders, he had never claimed Acker was with him, his brother, and Hannon the night of the murders until after his brother's arrest.
The State also called Acker's sister, who testified that Acker was angry with one of the victims and had told her the day after the murders that he had been at Ron Richardson's house the night before. Acker's testimony at Hannon's trial that he was at home the night of the murders was read to the jury. One of Acker's co-workers testified that although he could not recall precisely what Acker had said, he believed Acker told him that on the night of the murders, three men dropped Acker off at the apartment complex so he could pick up his truck, he left, and the other men might have gone inside the apartment.
In response to the State's case, Unterberger chose to call as his only witnesses two women whose testimony eliminated the possibility that Mike Richardson was the third killer. At the postconviction hearing, the trial court characterized these witnesses as "disasters" for the defense.
The first of these witnesses, Kamla Allersma, testified that she and Robin Eckert spent the evening of the murders at Ron Richardson's house. Allersma stated that Ron and Mike Richardson, Hannon, and Acker were present at the house. At some point, Ron Richardson, Hannon, and Acker left for several hours. Allersma testified that Mike Richardson remained at the house the entire time the other men were gone.
Unterberger also called Robin Eckert. Eckert testified that she and Allersma were in Ron Richardson's house the evening of the murders and that Hannon, Ron Richardson, and Acker left the house for several hours and came back shortly before midnight. In response to questions from Unterberger, Eckert recounted overhearing Ron Richardson say, "We murdered `em," and his threat regarding her son. On cross-examination, Eckert stated that Ron Richardson was speaking to Hannon and Acker when he said, "We murdered `em," and that what Ron Richardson *81 said to her was: "Keep your mouth shut or they'll kill your child." (Emphasis added.) Eckert also confirmed on cross-examination that Mike Richardson did not leave the house the entire night.
Allersma and Eckert had made previous statements, consistent with Ron Richardson's trial testimony, to the effect that they left Ron Richardson's house at 8:00 p.m. that night and did not return. Although Unterberger knew of both witnesses' prior inconsistent statements, he explained at the postconviction hearing that he did not impeach them with the statements because they were his own witnesses.
In its closing argument, the State seized upon the testimony of Eckert and Allersma, arguing it corroborated Ron Richardson's testimony and showed that Mike Richardson could not have been one of the murderers. The State also pointed out that Eckert had testified Acker was standing next to Ron Richardson when he said, "We murdered `em," and suggested the threat Ron Richardson made, "they'll kill your child," was further evidence that Acker and Hannon were the killers (emphasis added). In its closing, the State also referred to Unterberger's concession in his opening statement that "there's certainly some evidence" that Acker was the third person who went to the apartment. The prosecutor then said, "I submit to you, folks, there's more than some evidence; there's a whole lot of evidence...."
In the defense closing argument, Unterberger acknowledged that there was evidence that Acker had tried to change his appearance after the murders by cutting his hair. Unterberger then argued to the jury that Acker's actions could be explained by assuming Acker was at the scene of the crime:
So, if you proceed on the assumption that all three of them were there, then you have to examine the evidence based on that assumption because if all three of them were there, then I don't see how anyone could really say that all three of them were aware that, when they left, that they passed certain people, that all three of them knew that they were coming from an apartment where this event occurred and that therefore, all three might be concerned about being connected with this thing.
So, if you operate on that assumption, it would account for Mr. Hannon's actions; it would account for Mr. Acker's actions as shown by the evidence, and it would account for Mr. Richardson's actions.
(Emphasis added.)
Unterberger addressed the inconsistencies in Acker's statements by conceding Acker was at the scene of the crime, saw the murders, and was afraid of being implicated:
There are a series of statements attributable to Mr. Acker which I would be remiss if I didn't address and that I didn't address candidly. The statements don't help Mr. Acker's case. The statements attributable to him are inconsistent in some respects. In other respects, they clearly conflict with testimony from certain witnesses. I can't deny that and I wouldn't try to deny that.
And I suggest to you that Mr. Acker, like Mr. Richardson and like Mr. Hannon, since the evidence shows that all three of them were there, was, like Mr. Hannon and like Mr. Richardson, afraid. He was there; he saw. Richardson was there; he saw. Hannon was there; he saw....
... the evidence is all three of them were there and all three of them, for fear of being implicated, did something to *82 try to avoid being implicated, either lied to the police, changed appearance, put on some different clothes.

(Emphasis added.)
Unterberger also conceded that the testimony of Eckert and Allersma showed Acker was with Hannon and Ron Richardson both before and after the murders and even suggested their testimony showed Acker was at the scene of the crime:
I put on the two girls, one of whom was the State's witness last year, so I'm not trying to impeach Kamla. I'm not trying to impeach Robin. I mean, I put them on. And they said, and the evidence, I can't contest the evidence, that my guy was there. My guy left with the others and my guy came back.

(Emphasis added.)
After having conceded his client's presence at the scene of the crime, Unterberger argued that Ron Richardson's mere presence at the scene of the crime meant Richardson was also necessarily guilty of first-degree murder under the felony murder rule. As Unterberger explained to the jury, "[I]f someone dies in the course of a commission of a burglary, and whether or not you're the actual killer or not, if you're a participant in the burglary, you're as guilty as the one who actually committed the crime." Unterberger also suggested to the jury that Acker made a mistake "if he was like Ron Richardson," because Acker, rather than Richardson, could have made a deal with the State and exculpated himself and incriminated someone else. Unterberger then stated, "I'm not advocating that he should have done that because I don't know if he would be lying or telling the truth." Nowhere in closing argument did Unterberger argue any of the theories of defense he had identified prior to trial. Nor did he ever ask the jury to find Acker not guilty.
In its rebuttal closing argument, the State emphasized Unterberger's concession of his client's presence at the scene of the murders both as to its theory of first-degree murder and as to its alternative theory of felony murder. The State again pointed out to the jury the defense's elimination of the Mike Richardson theory of defense, telling the jury, "For a time during the trial, it seems that Mike Richardson was going to be the prime suspect as the other killer. Mr. Unterberger called witnesses that had no axe to grind, but took Mike Richardson right out of it."
After the jury began deliberating, Unterberger informed the trial court that Acker had a complaint regarding Unterberger's representation in conceding Acker's presence at the scene of the offense. Unterberger explained that he had to make his argument in view of the evidence presented. Acker himself added, "I feel I have been ineffectively counseled through this from what I talked with Mr. Unterberger about didn't happen." The trial court informed Acker that in the event he was convicted, he could raise this issue by filing a motion claiming that his lawyer was ineffective.
The right to counsel under the Sixth Amendment "`is the right to the effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). To prove a claim of ineffective assistance of counsel, the defendant must establish that: (1) "counsel's performance was deficient" in that "counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance prejudiced the defense" because "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is *83 reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The prejudice prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The standard of review as to whether counsel's performance was deficient and whether the deficiency prejudiced the defendant are mixed questions of law and fact, requiring de novo review. See Strickland, 466 U.S. at 698, 104 S.Ct. 2052; Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). Here, counsel's errors in failing to develop a coherent theory of defense, introduction of damaging testimony, and giving a closing argument harmful to Acker have undermined our confidence in the outcome of Acker's trial.
Counsel did not pursue a coherent theory of defense based on any of the potential theories he had identified prior to trial. Counsel's introduction of testimony harmful to his client hampered his development of a coherent theory of defense. Although counsel wanted to have Robin Eckert testify to Ron's statement, "We murdered `em,"her testimony was extremely damaging to the defense. When Eckert testified, she clarified that Hannon and Acker were standing nearby when Ron said, "We murdered `em," and that Ron said if she didn't keep her mouth shut, they would murder her son. In addition to linking Acker to this statement, Eckert, as well as Allersma, provided an alibi for Mike Richardson. At the postconviction hearing, counsel testified that he was not surprised by Eckert's and Allersma's testimony. Although the decision to call Eckert and Allersma as defense witnesses may have been trial strategy, it was not reasonable trial strategy. See Cabrera v. State, 766 So.2d 1131 (Fla. 2d DCA 2000) (holding that decision to forego entrapment defense was not a reasonable trial tactic when no other defense was available).
By not cross-examining Pam Deimund about her description of the second man she saw at the apartment complex and by putting on the testimony of Robin Eckert and Kamla Allersma, counsel could not raise a reasonable doubt by suggesting that Mike Richardson was the third person who went in the apartment with Ron Richardson and Hannon. The murderers had used Mike Richardson's car and a gun that had belonged to him, and Ron Richardson had changed his story and implicated Acker. Counsel never suggested that Ron Richardson may have been covering up for his brother.
The State argues, and the trial court concluded, that counsel had a coherent theory of defense and presented it in closing argumentreasonable doubt based on Ron Richardson's lack of credibility. In closing, counsel conceded that Acker was "there" and he "saw" on the night of the murders. Later in the argument, he discussed Ron Richardson's presence at the scene and the felony murder rule. Counsel attacked Ron Richardson's credibility, but the attack was on collateral issues and about whether he was involved in the murder, not about Acker's lack of involvement. Counsel never suggested that Acker did not participate in the murders, and he never asked the jury to bring back a verdict of not guilty.
We recognize that there was other evidence that was harmful to Acker. He had the greatest motive to commit the murders. The day before the murders Acker learned that one of the victims, Brandon Snider, had shot up Acker's mother's house and left threatening messages for Acker's sister, who was Brandon's ex-girlfriend. The jury also learned of Acker's *84 testimony from Hannon's trial that he claimed to be home with his wife and child on the night of the murders. Acker's other sister, Rhonda Abel, testified that Acker told her that he had been at Ron Richardson's house on the night of the murders, but he was going to say that he was at home because Ron had a warrant out, and he did not want to get Ron in trouble.
Thus, the jury had before it evidence that both Ron Richardson and Acker had lied about the events of the night of the murder. We conclude, however, based on the cumulative errors that counsel committed, that there was a reasonable probability that counsel's errors affected the outcome of the case. Therefore, we reverse and remand for a new trial.
Reversed and remanded.
PATTERSON, C.J., ALTENBERND and SALCINES, JJ., Concur.